UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
TERRY BRANCH,

                Petitioner,

     -against-

LUIS R. MARSHALL, SUPERINTENDENT,

                Respondent.
-------------------------------------------------------X

: <u>REPORT AND</u>
: <u>RECOMMENDATION</u>
:
: 08 Civ. 8381 (PKC)(JLC)
:
: (Non-ECF Case)
:
:

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:**
**DATE FILED:** 10/12/10

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable P. Kevin Castel, United States District Judge:**

**I.    INTRODUCTION**

    <u>Pro se</u> petitioner Terry Branch ("Branch" or "Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his July 15, 2004 conviction in New York Supreme Court, New York County.  Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus by a Person in State Custody, dated September 9, 2008 (the "Petition") (Doc. No. 1).  After a jury trial, Branch was convicted of two counts of robbery in the first degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree.  Transcript of Trial ("Tr. Trans."), vol. 3 at 621-29 (Doc. No. 10).  He was sentenced to a determinate prison term of fifteen years for the robbery charges, fifteen years for the second-degree weapons possession charge, and seven years for the third-degree weapons possession charge.  Tr. Trans., vol. 3 at 14-15.  Branch is currently incarcerated at Sing Sing Correctional Facility.

    On September 9, 2008, Branch filed a petition for writ of habeas corpus in this Court,[1] asserting three claims: (1) deprivation of his constitutional right to a fair trial when the Appellate

---

[1] The Petition was stamped "Received by the Pro Se Office on September 10, 2008" and was filed on the Court's docket on September 30, 2008.  However, because Branch is representing himself, he



Division affirmed the trial court's denial of his motion to sever his trial from that of his co-defendant, Robert Mitchell ("Mitchell"); and (2) ineffective assistance of appellate counsel for failing to argue that (i) the prosecutor committed misconduct when she made certain statements during summation regarding the identification of Branch, and (ii) his conviction was based on legally insufficient evidence because there was no identification of him at trial.

For the reasons set forth below, I recommend that the petition be DENIED.

## II.   LEGAL AND FACTUAL BACKGROUND

### A.   The Facts Giving Rise to Petitioner's Arrest

Beginning in June, 2004, Branch and Mitchell were tried jointly before the Honorable Edwin Torres, J.S.C. in State Supreme Court, New York County. Neither defendant testified, nor did they call witnesses or present any other evidence on their behalf. The prosecution called David Barbee ("Barbee"), Amy Rodriguez ("Rodriguez"), and several members of the New York City Police Department. The following facts are derived from the evidence presented by the prosecution:

Shortly after midnight on September 7, 2003, Barbee and Rodriguez sat in a parked car near a Manhattan night club on West 21st Street, between Fifth and Sixth Avenues. Tr. Trans., vol. 2 at 39:8-40:12. Barbee sat in the driver's seat and Rodriguez sat beside him in the passenger seat, when two men abruptly approached the driver's side window. Id. at 44:7-17; 48:14-18; 49:11-16. One of the men – wearing a dark t-shirt and later identified as Mitchell – pointed a gun at Barbee's head. Id. at 48:1-5; 49:17-50:2; 61:10-62:9; 66:8-14. The second man

---

benefits from the "prison mailbox rule," which provides that a petition for writ of habeas corpus is deemed filed on the day it is handed to prison officials for mailing. Houston v. Lack, 487 U.S. 266, 276 (1988). In this case, Branch signed and dated the habeas corpus petition September 9, 2008 (Doc No. 1), so I will assume for purposes of this Report and Recommendation that this is the date that he handed the Petition to prison officials for mailing.

wore a white t-shirt and stood directly beside the gunman. <u>Id.</u> at 48:9-10, 59:4-6, 60:5-13, 66:15-19.

Both men commanded Barbee to turn over his watch, as they grabbed his left arm in an attempt to pull his watch from his wrist. <u>Id.</u> at 44: 13-15, 45:9-10, 50:4-25, 51:10-15. A struggle ensued. <u>Id.</u> at 50:4-23, 151:21-152:11, 152:15-153:3. Within a matter of seconds, the gun discharged inside the vehicle, Barbee's watch was snapped off his wrist, and the assailants absconded. <u>Id.</u> at 45:20-25 53:5-10, 152:4-11. Neither Barbee nor Rodriguez was hurt. <u>Id.</u> at 25-26, 52:4-7.

The assailants ran away from Barbee's vehicle and jumped inside a green Acura parked on the opposite side of the street. <u>Id.</u> at 46:8-9, 53:16-23, 86:14-24. Mitchell got in the front passenger side of the Acura and the man wearing the white t-shirt jumped in the back seat. <u>Id.</u> at 49:7-16; 53:24-54:9. Barbee drove after the getaway car as it pulled off and headed west. <u>Id.</u> at 54:14-15. While pursuing the green Acura, Barbee called 911 from his mobile phone and reported the license plate number. <u>Id.</u> at 46:13-14, 55:13-16, 128:3-8. He followed the vehicle as it made a left turn onto Ninth Avenue. <u>Id.</u> at 56:4-12. On the corner of Ninth Avenue and 21st Street, Barbee spotted a marked police car and, while pointing to the green Acura, told the officers that "they" had just shot at him. <u>Id.</u> at 56:8-57:5; vol. 3 at 192:4-193:6; 233:6-10.

The officers pulled over behind the Acura, <u>id.</u>, vol. 3 at 231:7-17, at which point Mitchell immediately jumped out of the car and proceeded to run south on Ninth Avenue. <u>Id.</u> at 196:23-197:6. Several officers chased Mitchell, eventually capturing him as he attempted to jump over a fence into a schoolyard. <u>Id.</u> at 299:6-25. During the chase, the police officers observed Mitchell throw a shiny, silver object beneath a parked car. <u>Id.</u> at 297:24-298:10. The object was recovered by officers later that evening and subsequently identified as the gun used during the

robbery.  Id. at 312:9-24.  A search of Mitchell's person resulted in the recovery of Barbee's watch.  Id. at 267:13-19.

Meanwhile, police officers apprehended the occupants of the green Acura.  Branch and the driver of the Acura, Iam Fredericks, were removed from the car, placed face down on the ground, and handcuffed.  Id. at 227:6-17, 265:6-12.  Branch did not resist arrest.  Id. at 241:18-242:1.  Police Officer Christopher Shaughnessy ("Shaughnessy"), who had arrived at the scene only moments before, assisted in apprehending him.  Id. at 234:18-21.  Sitting about six to eight feet away from Branch, id., vol. 2 at 60:5-13, Barbee pointed to the green Acura and to Branch and told a police officer that "they" had taken his watch and shot at him.  Id. at 59:21-25, 113:13-23, 136:8-16.  Branch was handcuffed and standing near the green Acura when Barbee made the identification.  Id., vol. 3 at 233:6-10.  Although it was late at night, the street was well-lit and Barbee had an unobstructed view of Branch.  Id., vol. 2 at 60:5-20; vol. 2 at 236:7-17.

No police-arranged line-up or photo array of Branch took place.  Id., vol. 3 at 334:22-335:3.  Barbee later identified Mitchell as the gunman.  Id., vol. 2 at 61-62, 71, 113, 131-32, 134.

**B.    The Pre-Trial Suppression Hearing**

On February 11, 2004, Branch and Mitchell appeared for a Wade/Mapp hearing before the Honorable Joan Sudolnick, J.S.C.[2]  See Tr. Trans., vol. 1 (Wade/Mapp Hearing).  As to the Wade portion of the hearing, the defendants had moved to suppress any prospective in-court identification of them by Barbee, arguing that the police failed to conduct a line-up and that Barbee's identification the night of the crime was unduly suggestive.

Police Officers Richard Mingoia ("Mingoia"), Brian Erbis ("Erbis"), Louis Scala, and Shaughnessy testified at the suppression hearing.  Mingoia testified that he and his partner were on duty the night of September 7, when they responded to a radio transmittal that shots had been

---

[2] The Mapp portion of the hearing focused on the seizure by police officers of Barbee's watch from Mitchell's person.

fired in the vicinity of 21st Street. Id., vol. 2 (Wade/Mapp Hearing), at 5:5-6:10. No vehicle description or other identifying information regarding the shooter had been transmitted. Id. at 15:24-16:16.

The officers proceeded to drive south to 21st Street and Ninth Avenue, where they saw Erbis, who was directing traffic. Id. at 8:14-25. The three officers spoke with one another about the transmittal, when Barbee suddenly stopped his car in the middle of the intersection and started "yelling and screaming [at the officers] that the guys in the car [had] just [taken] a shot at him." Id. at 8:19-9:19. Barbee was pointing towards a green Acura. Id. Mingoia and his partner, who were in a marked police car, turned on the overhead lights and parked directly behind the Acura. Id. at 15:2-12. Mitchell jumped out of the passenger side of the Acura, proceeded to run southbound, and a chase immediately ensued. Id. at 11:11-24, 68:18-69:5, 70:7.

Shaughnessy testified that he was on duty when he heard a radio transmittal that shots had been fired, and that dispatch had provided a license plate number and vehicle description. Id. at 41:11-42:3. As he and his partner approached the intersection of 20th Street, a second radio transmittal reported a foot pursuit. Id. at 26:15-27:4. When Shaughnessy arrived at the scene, he observed Barbee "screaming [that] they had shot at him," as he pointed to a green Acura located fifteen to twenty feet away. Id. at 28:4-19, 30:9-21. At the police's command, Branch stepped out of the "rear passenger side" of the Acura, at which point Shaughnessy assisted another officer in placing him under arrest. Id. at 28:20-29:19.

At the conclusion of the hearing, Justice Sudolnick found that the police officers had probable cause to act upon Barbee's statements to them that he had just been shot at by the occupants of the green Acura. Id. at 149:9-27, 150:13-17. The court further found that Barbee's

identification of Branch was spontaneous, and neither police-arranged nor unduly suggestive.  <u>Id.</u> at 150:24-151:4.

**C.     Mitchell's Failed Plea Allocution**

Immediately before the suppression hearing commenced, Mitchell's attorney informed the court that the prosecutor had offered the defendants a joint plea deal.  The terms of the offer provided that Branch and Mitchell would each receive an eight-year prison sentence in exchange for a guilty plea.  <u>Id.</u>, vol. 1, 3-4.  The deal was a "no-split" offer, meaning that it was only valid as long as *both* defendants pled guilty to all counts.  <u>Id.</u> at 3:12-23.

After a mid-day adjournment, Mitchell appeared in court with his attorney and attempted to plead guilty.  <u>Id.</u> at 11:12-24.  Branch was not present.  <u>Id.</u> at 12:1-2.  During the allocution, Mitchell stated, under oath and in open court, that Branch was unaware Mitchell intended to commit a robbery and that he did not know that Mitchell was armed.  Specifically, Mitchell stated the following:

> THE COURT:  Were you on the street with Terry Branch?
>
> DEFENDANT-MITCHELL:  Yes, Ma'am.
>
> THE COURT:  Did you have a gun in your possession?
>
> DEFENDANT-MITCHELL:  Yes, Ma'am.
>
> THE COURT:  Was that gun loaded and operable?
>
> DEFENDANT-MITCHELL:  Yes, Ma'am.
>
> THE COURT:  Did Terry Branch know you had the gun?
>
> DEFENDANT-MITCHELL:  No, Ma'am.
>
> THE COURT:  He didn't know you had a gun?
>
> DEFENDANT-MITCHELL:  No.
>
> (Whereupon, [Mitchell's attorney] conferred with Mr. Mitchell)

6

DEFENDANT-MITCHELL:  At the moment Terry Branch did not know I had a gun at the time.

THE COURT:  You mean before you approached the car?

DEFENDANT-MITCHELL:  Yes, so I pulled out the gun.  As I pulled out the gun, I robbed the man.  I told the man, "Give me your watch."  At the present moment he wouldn't give me the watch.  At that time the gun went off, the gun, so I panicked and I got scared so I snatched the watch and I ran down the block and I got in the car and that's when Terry Branch and Iam Fredericks was in the car.

**************

THE COURT:  Did Terry Branch know you were going to rob this man in the car?

DEFENDANT-MITCHELL:  No, Ma'am.

THE COURT:  So you just did it by yourself and Terry Branch was just standing there doing nothing?

DEFENDANT-MITCHELL:  They wasn't aware.  What I am saying, they weren't aware that I was going to rob the man because at the time Iam Fredericks was there dropping off his sister and I seen him and I told him that I want to rob, so he was, all right, he went down the block.  So at the time they didn't know what I was going to do.

Id. at 18:2-19:24.  For reasons unexplained in the record, the court was not satisfied with Mitchell's attempted allocution and declined to accept his plea.  Id. at 19:25-20:2.

At the conclusion of the hearing, Mitchell's attorney reiterated his client's desire to plead guilty to the charges.  Id., vol. 2 at 151:13-16.

**D.      Severance Motion**

On April 6, 2004, Branch filed a motion to sever pursuant to section 200.40 of the New York Criminal Procedure Law ("C.P.L.").  See Declaration of Paul M. Tarr in Opposition to the Petition for Writ of Habeas Corpus, dated March 2, 2009 ("Tarr Decl."), Ex. A (Affirmation of Michael D. Stalonas, dated April 6, 2004).  In an affidavit by his trial attorney, Branch argued that Mitchell would provide exculpatory testimony on his behalf if Mitchell were tried first.  Id. at ¶¶ 13, 16.  Mitchell would purportedly testify consistent with his statements at the failed

allocation, which, Branch argued, exonerated him of the charges. Id. at ¶ 16.   Branch further argued that if Mitchell were tried first, he would have nothing to lose by subsequently testifying on behalf of Branch, regardless of the outcome of his own trial. Id. at ¶¶ 14-15.

The trial court, per Justice Daniel FitzGerald, J.S.C., denied the motion.   Justice FitzGerald doubted whether Mitchell would testify, regardless of the order of the trials, reasoning that Mitchell could invoke his Fifth Amendment privilege against self-incrimination until all of his appeals were exhausted, thus making his testimony unavailable to Branch for years. Tarr Decl., Ex. B (Memorandum and Order dated June 2, 2004).

### E.     The Trial

At trial, Barbee was unable to identify with certainty either Mitchell or Branch.   Tr. Trans., vol. 2 at 47:2-6.   When pressed by the prosecution to make an in-court identification, Barbee pointed to the defendants and stated: "[I]t look[ed] like them two right there.   I'm not positively sure." Id.  Barbee also testified, however, that he never lost sight of the green Acura from the time that Branch and Mitchell entered the vehicle (immediately after the robbery), until their apprehension by police officers. Id. at 55:23-25.   Nor did Barbee observe anybody exit the Acura the entire time he pursued the vehicle. Id. at 55:26-56:3.

During its case in chief, the prosecution played an audio recording of Barbee's 9-1-1 call the night of the robbery, where he told the operator that four black men were inside the green Acura. Id. at 109:8-110:11.   On cross-examination, Barbee explained that he confused the head rests in the vehicle for the number of individuals he believed to be inside the vehicle. Id.

Branch's attorney also read back a portion of Barbee's grand jury testimony where he testified that the man wearing the white shirt who exited the green Acura was also wearing "a white headband." Id. at 108:8-18.   At trial, Barbee had no recollection of having testified that the second assailant was wearing a headband. Id. at 108:19-24.   Shaughnessy also testified,

8

during cross-examination, that Barbee did not specifically point at Branch, but that Barbee had pointed in the direction of the green Acura, and that he had not attributed any specific act to Branch. Id., vol. 3 at 245:22-246:3.

On August 5, 2004, the jury found Branch and Mitchell guilty of two counts each of first-degree robbery, and one count each of second and third-degree weapons possession. Id. at 621:1-622:3.

### F.    State Court Appeals

Represented by new counsel, Branch appealed his conviction to the Appellate Division, First Department.   On December 12, 2005, the Appellate Division affirmed the conviction. People v. Branch, 35 A.D.3d 228, 825 N.Y.S.2d 215 (1st Dep't 2005).   The Court of Appeals denied leave to appeal on March 12, 2007.   8 N.Y.3d 919 (N.Y. 2007).

On May 2, 2008, Branch, proceeding pro se, filed in the Appellate Division a writ of error coram nobis, pursuant to C.P.L. § 330.   Tarr Decl., Ex. M (Writ of Error Coram Nobis ("Coram Nobis Application")).   In his application, Branch argued that appellate counsel had been ineffective because she failed to (i) challenge Barbee's identification of him, and (ii) argue the prosecutor committed reversible error by making certain statements during summation regarding his identification.   Id.   The Appellate Division denied the application on July 15, 2008. Id., Ex. P (Order dated July 15, 2008).   The Court of Appeals denied leave on October 3, 2008. Id., Ex. S (Certificate Denying Leave).   Branch did not file a writ of certiorari with the United States Supreme Court.

## III.    DISCUSSION

### A.    Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within one year of "the completion of direct appellate review in the state

court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] the time to seek direct review via certiorari." Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001); 28 U.S.C. § 2244(d)(1)(A) (2000) (judgment becomes final upon "the conclusion of direct review or the expiration of the time for seeking such review").

Here, the New York Court of Appeals denied leave on March 12, 2007, 8 N.Y.3d 919, and the conviction became final 90 days later on June 11, 2007 – the date on which his time to seek a writ of certiorari to the United States Supreme Court expired. See Williams, 237 F.3d at 151. As a result, Branch had until June 11, 2008 to file the Petition. 28 U.S.C. § 2244(d)(1)(A). Yet the Petition was filed on September 9, 2008 – 90 days after the one-year deadline. But for a statutory tolling of at least 90 days, the Petition would be out of time. A state post-conviction motion filed within one year of the AEDPA limitations period tolls the statute during the pendency of the prisoner's application for federal habeas purposes. 28 U.S.C. § 2244(d)(2). See also Fernandez v. Artuz, 402 F.3d 111, 112-13 (2d Cir. 2005). Branch filed the application for coram nobis relief with the Appellate Division on May 2, 2008, within the AEDPA one-year limitations period. Tarr Decl., Ex. M (Coram Nobis Application). Accordingly, the statute of limitations was tolled 153 days from May 2, 2008 until October 3, 2008, when the Court of Appeals denied leave on that application. Id., Ex. S. Thus, the Petition is timely.

**B.    Exhaustion**

A petitioner must exhaust all state judicial remedies before a federal court may consider a petition for habeas relief. 28 U.S.C. § 2254(b)(1)(A). See Picard v. Connor, 404 U.S. 270, 275 (1971) ("[T]he substance of a federal habeas corpus claim must first be presented to the state courts."); Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997). Predicated on principles of comity, the exhaustion requirement is intended to provide the state with "a fair opportunity to consider

the [constitutional] claim and to correct that asserted constitutional defect." Picard, 404 U.S. at 276. A petitioner fulfills this requirement in two ways. First, the petitioner must place before the state court the same legal doctrines and factual assertions advanced in the habeas petition. Id. at 275-76; Petrucelli v. Coombe, 735 F.2d 684, 687 (2d Cir. 1984); Daye v. Attorney General of New York, 696 F.2d 186, 191-92 (2d Cir. 1982). Second, the petitioner must present his claims "to the highest state court on direct appeal." Daye, 696 F.2d at 191 n.3. "A prisoner has not fairly presented a federal claim before a state court if the federal claim is not mentioned in the prisoner's state court brief." Richardson v. Superintendent of Mid-Orange Correctional Facility, No. 09-3655-pr, 2010 WL 3619781, at *3 (2d Cir. Sept. 20, 2010) (citing Baldwin v. Reese, 541 U.S. 27, 32 (2004)).

The claims raised in the Petition have been properly exhausted. Branch claims the decision of the trial court to deny his motion to sever violated his constitutional rights and that he suffered undue prejudice because Mitchell would have provided exculpatory testimony on his behalf. Petition, ¶ 13. His brief to the Appellate Division similarly asserts that the decision of the trial court not to sever violated his rights under the Sixth and Fourteenth Amendments, and under C.P.L. § 200.40(1). Tarr Decl., Ex. D (Brief for Defendant-Appellant) at 32. Branch advanced the same arguments in his letter seeking leave to appeal to the Court of Appeals. Id., Ex. J (Letter from Barbara Zolot to Hon. Carmen Beauchamp Ciparick, dated January 17, 2007), at 1-3.

Second, Branch claims he received ineffective assistance of counsel on appeal when his attorney failed to argue that (i) his conviction was based on legally insufficient evidence because he was never properly identified as one of the robbers, and (ii) statements made during summation by the prosecutor regarding his identification constituted prosecutorial misconduct. This claim was properly brought before the Appellate Division in a coram nobis application, and

the Court of Appeals subsequently denied leave.  Id., Exs. M (Coram Nobis Application), Q (Letter from Terry Branch to Hon. Judith S. Kaye, dated July 28, 2008 ("Coram Nobis Appeal Letter")), at 2.  Since Branch's claims are properly exhausted, the Court will address them on the merits.

### C.    Standard of Review

"In conducting habeas review, a federal court is limited to deciding whether a conviction violates the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Where a state court has addressed a petitioner's claim on the merits, a federal court may provide habeas relief only where the petitioner demonstrates that the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2); Knowles v. Mirzayance, – U.S. –, 129 S. Ct. 1411, 1418 (2009).  See Miller-El v. Dretke, 545 U.S. 231, 240, 266 (2005) (reversing denial of habeas relief where petitioner demonstrated state court was "wrong to a clear and convincing degree" in finding prosecutors did not strike potential jurors because of race).

A state court decision is "contrary to" clearly established Federal law "if it 'contradicts the governing law' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from' the Supreme Court."  Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  As long as the state court decision applies the correct legal rule to the facts of a petitioner's case, it is not subject to habeas review, even if the federal court would have reached a different conclusion if it were to apply the rule itself.  Williams, 529 U.S. at 406.

12

A state court decision is "based on an unreasonable determination of the facts" if the court correctly identifies the legal rule set forth in governing Supreme Court cases, but unreasonably applies the rule to the facts of the case. Id. at 407. For the purpose of federal habeas review, the factual determinations made by a state court are presumed correct, and a petitioner bears the burden of rebutting this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A federal court may grant habeas relief only where the state court decision as it pertains to any issue of federal law was "objectively unreasonable" in light of relevant precedent; thus, in construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Williams, 529 U.S. at 411. See Besser v. Walsh, 601 F.3d 163, 178 (2d Cir. 2010) ("The proper inquiry is not whether a state court's application of, or refusal to extend, the governing law was erroneous, but whether it was 'objectively unreasonable'") (quoting Williams, 529 U.S. at 409-10).

The Court notes that Branch is proceeding pro se, and therefore his submissions should be held to "less stringent standards than formal pleadings drafted by lawyers." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)); see also Seidemann v. Bowen, 584 F.3d 104, 118 (2d. Cir. 2009). In addition, the court must liberally construe the pleadings and interpret them "to raise the strongest arguments that they suggest." Diaz v. United States, 517 F.3d 608, 613 (2d Cir. 2008) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Pro se status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotations omitted).

**D.    Petitioner's Claims**

1.    Denial of Motion to Sever

Branch first contends that he was denied a fair trial because he was forced into a joint trial with Mitchell, who would have provided exculpatory testimony on his behalf had their trials been severed and Mitchell tried first.  To the extent Branch bases this claim on the state court's application of C.P.L. § 200.40, he is alleging an error of state law for which habeas relief is not available, unless the denial of the motion to sever violated his Federal constitutional rights.  See Estelle, 502 U.S. at 67-68 ("we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions . . . a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States").  Otherwise, the Court must consider whether, under the AEDPA, the Appellate Division unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  The Court finds that it did not.

The decision whether to grant a motion to sever is left to the discretion of the trial court, and such decisions are reversed only upon a showing that the trial court abused its discretion. Opper v. United States, 348 U.S. 84, 94-95 (1954); United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002).  The Second Circuit has described the denial of a motion to sever as "virtually unreviewable." United States v. Nieves, 354 Fed. Appx. 547, 552 (2d Cir. 2009) (quoting United States v. Yousef, 327 F.3d 56, 150 (2d Cir. 2003)); see also United States v. Stewart, 433 F.3d 273, 314 (2d Cir. 2006) (quoting Yousef, 327 F.3d at 150).

A petitioner claiming a due process violation as a result of the denial of severance must demonstrate that "actual prejudice resulted from the events as they unfolded during the joint trial." Herring v. Meachum, 11 F.3d 374, 377-78 (2d Cir. 1993) (citing Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976)); see also United States v. Diaz, 176 F.3d 52, 102 (2d Cir.

1999) (denial of severance subject to reversal "only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion").  A finding of actual prejudice is rare, as a petitioner must demonstrate prejudice "so severe that his conviction constituted a miscarriage of justice." Yousef, 327 F.3d at 150.  See, e.g., Nieves, 354 Fed. App'x at 552 (no prejudice where evidence of other crimes committed by co-defendant admitted at trial); Stewart, 433 F.3d at 315 (no prejudice where limiting instructions given and defendant convicted of less than all charges); Smith v. Mann, 208 F.3d 203, at *1 (2d Cir. 2000) (summary order) (possibility that defendant "stood a better chance of acquittal" had trial been severed "does not amount to a due process violation"); United States v. Carrillo, 166 F.3d 1202, *at 1 (2d Cir. 1998) (summary order) (no prejudice where defendant "refrained from going forward with his best defense out of a desire to avoid . . . antagonism" with co-defendant); United States v. Serpoosh, 919 F.2d 835, 837 (2d Cir. 1990) (petitioner "must show prejudice so severe as to amount to a denial of a constitutionally fair trial").  Thus, the pivotal inquiry is whether the prejudice suffered by the petitioner was substantial.  For several reasons, the Appellate Division's affirmance of the trial court's denial of the motion to sever did not deprive Branch of due process.

First, the circumstances of this case supported a joint trial.  As Branch conceded in his motion to sever filed with the trial court, "the criteria of § 200.40(1)(c) [were] met, as 'all of the offenses charged [were] based upon the same criminal transaction . . .'"  Tarr Decl., Ex. A (Motion to Sever) at 4, ¶ 7.  Indeed, Branch's conduct was closely intertwined with that of Mitchell's, as evidenced by the defendants' joint indictment.  Moreover, the prosecution presented virtually the same evidence against both defendants, including eyewitness testimony that Branch actively participated in the robbery with Mitchell.  Tr. Trans., vol. 2 at 55:23-56:3.  Thus, judicial economy and the administration of justice weighed in favor of a joint trial.  See

Zafiro v. United States, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); Richardson v. Marsh, 481 U.S. 200, 209-10 (1987) (joint criminal trials "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts"); United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) ("Considerations of efficiency and consistency militate in favor of trying jointly defendants who [are] indicted together."). See also People v. Mahboubian, 74 N.Y.2d 174, 183 (N.Y. 1989) ("a strong public policy favors joinder, because it expedites the judicial process, reduces court congestion, and avoids the necessity of recalling witnesses"). Had Branch and Mitchell been tried separately, two identical trials would have taken place and Branch still would have had to overcome the testimony of several eyewitnesses who placed him either at the scene of the crime, or emerging from the car that carried the alleged perpetrators.

Second, as Respondent correctly points out, Mitchell's offer to provide exculpatory testimony on Branch's behalf was conditional and speculative, at best. Resp. Mem. of Law at 3 (Doc. No. 9). "[O]ffers to testify . . . expressly conditioned on [the moving defendant] being tried last . . . smack[] of bad faith." United States v. Bari, 750 F.2d 1169, 1177 (2d Cir. 1984) (denying motion to sever where co-defendants offered to testify only if tried first). See Spinelli, 352 F.3d at 56 (denying motion to sever where co-defendant offered to provide exculpatory testimony only if tried before petitioner). Mitchell's offer to testify on behalf of Branch, only if Mitchell were tried first, strongly suggested that Mitchell would have invoked his privilege against self-incrimination at Branch's trial, regardless of the outcome of his own trial.

As the state trial court noted, if Mitchell had been acquitted in his own trial, he could have exposed himself to perjury charges had he subsequently testified that he alone committed the robbery. Tarr Decl., Ex. B at 3. If, on the other hand, Mitchell had been tried alone and found guilty – as he was in the joint trial – he would have likely invoked his Fifth Amendment

16

privilege against self-incrimination until his appeals were exhausted, thus rendering his testimony unavailable for several years. Id. As the trial court predicted, Mitchell did not testify at his own trial, and it was unlikely he would have waived his privilege against self-incrimination at a separate trial, particularly if his trial were still pending at the commencement of Branch's trial.

Assuming, however, that Mitchell had testified consistent with his attempted plea allocution, his testimony would not have undermined the prosecution's theory of the case: that Branch knowingly and willfully participated in the robbery, even if his participation was spur of the moment. Mitchell never stated during the allocution that Branch was not present at the time of the robbery, or that Branch did not participate in the robbery. Mitchell simply testified that Branch did not know that Mitchell was armed with a gun or that Mitchell was going to commit a robbery:

> THE COURT:  Did Terry Branch know you had the gun?
>
> DEFENDANT-MITCHELL:  No, Ma'am.
>
> THE COURT:  He didn't know you had a gun?
>
> DEFENDANT-MITCHELL:  No.
>
> (Whereupon, Ms. Powell conferred with Mr. Mitchell)
>
> DEFENDANT-MITCHELL:  At the moment Terry Branch did not know I had a gun at the time.
>
> ********
>
> THE COURT:  Did Terry Branch know you were going to rob this man in the car?
>
> DEFENDANT-MITCHELL:  No, Ma'am.

Tr. Trans., vol. 1 at 18:11-21, 19:11-13. When asked whether he committed the robbery alone, Mitchell was unable to provide a straight answer. He merely repeated that Branch did not

know what Mitchell was going to do; he never stated that Branch did not participate in the robbery:

> THE COURT:  So you just did it by yourself and Terry Branch was just standing there doing nothing?
>
> DEFENDANT-MITCHELL:  They wasn't aware.  What I am saying, they weren't aware that I was going to rob the man because at the time Iam Fredericks was there dropping off his sister and I seen him and I told him that I want to rob, so he was, all right, he went down the block.  So at the time they didn't know what I was going to do.

Id. at 19:14-24.  As the Appellate Division observed, Mitchell's testimony does not negate the possibility that Branch participated in the robbery at the last minute.  Tarr Decl., Exh. H at 43. His statements indicate, at most, that Branch did not initiate the scheme.  Id.  Barbee's testimony, corroborated by Rodriguez, that two men commanded him to turn over his watch militates against a finding that Branch was an innocent bystander during the crime.  Tr. Trans., vol. 2 at 44:13-15, 45:9-10, 50:4-25, 51:10-15, 151:14-153:3.  See United States v. Freedman, 317 Fed. App'x 22, 26 (2d Cir. 2008) (affirming denial of motion to sever where sworn affidavit of co-defendant did not offer exculpatory testimony and prosecution's case was based on "strong circumstantial evidence").

Branch relies principally on United States v. Echeles, 352 F.2d 892, 898 (7th Cir. 1965), to support his argument that a trial court may determine the order of trials so that a testifying co-defendant's guilt or innocence would have been adjudicated in the prior trial.  But Echeles is readily distinguishable.  First, the rule in Echeles has since been limited by the requirement that a defendant show "actual prejudice."  United States v. Caci, 401 F.2d 664, 672 (2d Cir. 1968) ("Subsequent cases, however, read [Echeles] narrowly, confining [its] application to cases in which a defendant can show 'real prejudice'").  Second, the facts of Echeles are inapposite.

In Echeles, the defendant made statements in open court three times that unequivocally exculpated the petitioner: during his own trial, during his [consummated] plea allocution, and

18

during his sentencing.  352 F.2d at 898.  Thus, it was unlikely the co-defendant would have

invoked his Fifth Amendment privilege and declined to testify on behalf of the petitioner.  Here,

privilege complications were readily foreseeable because Mitchell had not pled guilty.  This

distinction is critical.  Mitchell inevitably faced a trial, whether joint or alone, and therefore

faced the possibility of conviction and, if convicted, the possibility of appeal.  Mitchell's

attorney undoubtedly would have advised him to assert his Fifth Amendment privilege against

self-incrimination throughout the pendency of an appeal.

Branch also argues that because Mitchell's statement was made in open court, any doubt

as to the speculative nature of his testimony is diminished substantially by Mitchell's willingness

to forego a favorable plea deal in exchange for a trial in which he faced a substantial prison

sentence.  Pet'r Mem. of Law at 10-11 (Doc No. 6).  This argument is unavailing.  Applying the

highly deferential standard afforded trial courts on a motion to sever, the Second Circuit has

upheld the denial of severance in the face of similar testimony carrying equal weight.  Spinelli,

352 F.3d at 51 (sworn affidavit by co-defendant stating he would testify on defendant's behalf if

co-defendant were tried first); Bari, 750 F.2d at 1177 (affidavits by four co-defendants offering to

provide exculpatory testimony if tried first); Finkelstein, 526 F.2d at 523-24 (co-defendant

submitted affidavit stating he would not testify at joint trial but would testify on behalf of

petitioner if cases severed).

Finally, Mitchell's proffered testimony would have been subject to damaging

impeachment in light of the evidence corroborating the case against Branch.  Freedman, 317 Fed.

App'x at 26 (denial of severance affirmed where testimony of co-defendant would have been

"subjected to damaging impeachment").  Barbee testified that both Branch and Mitchell acted in

concert.  That is, both men held Barbee at gunpoint, grabbed his arm, yelled at him to turn over

his watch, pulled his watch off his arm, and ran towards the getaway car together.  Also, several

19

police officers testified that Branch and Mitchell both emerged from the green Acura.  It is also noteworthy that the trial court based its decision, in part, on its observation of Mitchell as an "unsavory character with a violent past" who would have been subject to impeachment, thus damaging Petitioner's defense.  Tarr Decl., Ex. B at 4.  The trial court was undoubtedly in the best position to make a determination as to Mitchell's credibility.  See United States v. Owen, 500 F.3d 83, 92 (2d Cir. 2007) ("Defendants sometimes will fail to persuade the court that prejudice will result if they are deprived of their codefendant's testimony, particularly when the court is not convinced that what the codefendant has to say is reliable.").

In sum, Mitchell's proposed testimony likely would not have resulted in Branch's acquittal, and the trial court properly denied Branch's motion to sever.  Branch does not come close to satisfying AEDPA's requirement that the decision denying the motion to sever was either contrary to, or an unreasonable application of, clearly established federal law.

### 2. Ineffective Assistance of Appellate Counsel

Branch's second claim alleges denial of effective assistance of appellate counsel.  He contends that appellate counsel, the Center for Appellate Litigation, failed to make two arguments on direct appeal: (1) that the prosecutor engaged in misconduct when she mischaracterized certain witness testimony during her summation; and (2) that there was no in-court identification of Branch as one of the perpetrators.  Pet'r Mem. of Law, at 1-10 (Doc No. 6).

Given these allegations, the Court must consider the "clearly established Federal law" regarding effective assistance of counsel, which is set forth in Strickland v. Washington, 466 U.S. 668 (1984), and its progeny.  The Supreme Court in Strickland held that a defendant demonstrates ineffective assistance of trial counsel by showing that (1) counsel's performance was deficient, and (2) the defendant was prejudiced as a result of the deficient performance.  Id.

at 687; Wiggins v. Smith, 539 U.S. 510, 521 (2003); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005).  The following year, the Supreme Court, in Evitts v. Lucey, 469 U.S. 387, 397, 402 (1985), extended the principles of Strickland to claims of ineffective assistance of appellate counsel.

Under the first Strickland prong, there is a strong presumption that the assistance rendered by an attorney is objectively reasonable. 466 U.S. at 688-89; Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) ("[J]udicial scrutiny of counsel's performance must be highly deferential") (citing Strickland, 466 U.S. at 689).  It is well-settled that an attorney is under no obligation "to advance every nonfrivolous argument that could be made."  Aparicio v. Artuz, 269 F.3d 78, 96 (2d Cir. 2001) (citing Evitts, 469 U.S. at 394).  See also Jones v. Barnes, 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies Anders.").  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  "[E]ven strategic choices made after less than complete investigation do not amount to ineffective assistance – so long as the known facts made it reasonable to believe that further investigation was unnecessary."  Id. at 690-91.  Thus, the law recognizes a distinction between a mistake that deprives a defendant of a right to a fair trial, and counsel's strategic decision not to pursue a weak claim.  See, e.g., Williams v. Taylor, 529 U.S. 362, 391 (2000) (meritorious Strickland claim where counsel failed to investigate and present mitigating evidence at sentencing); Ramchair v. Conway, 601 F.3d 66, 76-77 (2d Cir. 2010) (failure by appellate counsel to challenge claim met Strickland standard where claim was meritorious but omitted from appeal because of mistake of counsel); Henry, 409 F.3d at 64 (Strickland test met where counsel mistakenly obtained defendant's alibi for wrong date).

The second Strickland prong requires an affirmative showing of prejudice.  466 U.S. at 694; Gueits v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010).   A petitioner must show a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The second prong is premised on the idea that the justice system has been undermined because the outcome of the trial would have been different had the defendant had the benefit of competent counsel.  See United States v. Cronic, 466 U.S. 648, 659 n.26 (1984) ("[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.").   Thus, it is possible for a defendant to be denied effective counsel, but not have been prejudiced by such denial.  See, e.g., Mitchell v. Scully, 746 F.2d 951, 954-55 (2d Cir. 1984) (post-Strickland case finding no ineffective counsel claim where trial counsel erred in failing to inform defendant of affirmative defense where outcome would have been far worse had defendant actually pled the defense).

a.   Prosecutor's Comments During Summation

Applying the first Strickland prong, appellate counsel's performance can hardly be characterized as deficient.  On direct appeal, counsel filed a 48-page moving brief raising four issues: (i) the trial court erred in denying the motion to sever because Mitchell would have provided specific and exculpatory testimony on behalf of Branch; (ii) Branch was wrongly excluded from the courtroom for portions of the trial after making several outbursts, in violation of the Confrontation Clause; (iii) the court impermissibly delegated a judicial function when it sent a court officer into the jury room to advise the jurors that they could not have a written portion of the court charge in violation of the Fifth, Sixth and Fourteenth Amendments; and (iv) the sentence received by Branch was excessive.  Tarr Decl., Ex. D.

Appellate counsel also drafted a comprehensive leave letter to the Court of Appeals encouraging that court to consider what counsel contended was the significant issue of "whether the trial court misapplied the 'good cause' standard when it denied severance even though [Mitchell] made sworn statements in open court exculpating Branch and, by doing so, forwent a favorable plea bargain." Id., Ex. M at A23.

Nonetheless, Branch claims appellate counsel failed to argue that the prosecutor committed flagrant misconduct constituting reversible error when she stated, during summation, that (1) Barbee had identified Branch to Officer Shaughnessy as one of the robbers, (2) Barbee told Officer Shaughnessy that Branch had shot at him, and (3) Branch passed Barbee's watch to Mitchell while they were inside the green Acura. Id. at A22-23. The Court must decide whether the Appellate Division unreasonably applied the Strickland standard when it ruled that the failure of Branch's attorney to raise the argument on direct appeal did not rise to the level of ineffective assistance of counsel. The Court finds that it did not.

To establish that a prosecutor's misconduct was tantamount to a violation of due process, a petitioner must demonstrate that the prosecutor engaged in conduct so egregious that it rendered the trial fundamentally unfair. See Darden v. Wainwright, 477 U.S. 168, 182 (1986). Factors to consider in reviewing a claim of prosecutorial misconduct include "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Friedman, 909 F.2d 705, 709 (2d Cir. 1990). Branch's allegations of prosecutorial misconduct fail for several reasons.

First, Barbee testified that he identified Branch to a police officer after Branch was apprehended and removed from the Acura. Tr. Trans., vol. 2 at 59:21-25, 113:13-23, 136:8-16. That the prosecutor erroneously identified Shaughnessy as the particular police officer can hardly be characterized as egregious. Id., vol. 3 at 542:19-21. Second, testimony by Barbee,

23

Shaughnessy, Erbis, and Mingoia supported the prosecutor's statement during summation that Barbee had told the police that "they" – the occupants of the green Acura – had "shot at [him]." Id., vol. 2 at 56:23-57:8; vol. 3 at 192:4-193:9, 206:18-207:16, 290:5-291:24.

In any event, the prejudice purportedly suffered by Branch was mitigated in four ways. First, the statement that Barbee had identified Branch to Shaughnessy was corrected when the prosecutor read Barbee's testimony to the jury. Tr. Trans., vol. 3 at 546:6-15. Second, the prosecutor reiterated during summation the portion of testimony where Barbee stated that he was not "positively sure" the defendants had committed the crime. Id. at 532:4-8. Third, the trial judge explicitly instructed the jury to rely on its "own recollection, understanding and evaluation of the facts . . . irrespective of what the attorneys on either side of the case [had] said regarding the facts." Id., vol. 3 at 565:13:22. Fourth, Branch's trial attorney read to the jury the relevant excerpt of Shaughnessy's testimony stating that Barbee never "specifically point[ed] at [Petitioner] and [told him] he did anything." Id. at 503:24-504:1.

Finally, the prosecutor stated during summation that Branch passed Barbee's watch to Mitchell in the car prior to their apprehension. As Respondent asserts, this comment supported the prosecutor's theory that Branch did not run from the car because he no longer possessed the stolen watch. Resp. Mem. at 31 (citing Tr. Trans. vol. 3 at 558:11-17). This theory countered statements made by Branch's attorney during his own summation that Branch was innocent of any wrongdoing because he did not attempt to resist arrest as did Mitchell. Tr. Trans., vol. 3 at 483:4-15. The prosecution's explanation to the jury of its theory of a case does not constitute prosecutorial misconduct, particularly when the evidence supports the theory. See Alvarez v. Conway, No. 05 Civ. 3235 (NRB), 2005 WL 3434634, at *9 (S.D.N.Y. Dec. 13, 2005) ("[A]s a general matter both the prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments.").

24

An experienced appellate attorney could thus reasonably conclude that raising this argument would not have increased Branch's likelihood of success on appeal. Because the Court finds that the first Strickland prong is not satisfied, it need not consider the second prong. 466 U.S. at 698 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); Palacios v. Burge, 589 F.3d 556, 562 (2d Cir. 2009) (declining to reach "prejudice" prong under Strickland where petitioner could not satisfy performance prong).

      b.     Eyewitness Identification

The Court next addresses Branch's claim that appellate counsel failed to argue that his conviction was supported by legally insufficient evidence because (i) the police failed to conduct a line-up, and (ii) Barbee's identification of him on the night of the robbery should have been excluded.

As a preliminary matter, the Court notes that Branch asserted the identification argument in a pro se supplemental submission to the appellate court. Tarr Decl., Ex. E. The Appellate Division "considered and rejected [Branch's] remaining claims, including those contained in his pro se supplemental brief." Id., Ex. H. Thus, even if appellate counsel's performance was in fact deficient, Branch could not have been prejudiced because the appellate court considered the identification argument and rejected it. Consequently, he is unable to show a "reasonable probability" that, but for counsel's failure to raise the claim, the Appellate Division would have decided differently, since it did not. Strickland, 466 U.S. at 694.

Nonetheless, the Court will address the merits of this claim. In applying the first Strickland prong, it was not ineffective assistance of counsel to choose not to argue that Barbee's identification of Branch should have been suppressed.

In determining the constitutionality of a pre-trial identification, a court must consider whether the circumstances surrounding the out-of-court identification were unduly suggestive in light of "the totality of the circumstances." Neil v. Biggers, 409 U.S. 188, 198-200 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process"). But even an unduly suggestive identification procedure will "not violate due process so long as the identification possesses sufficient aspects of reliability." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). In assessing the reliability of the identification, a court should consider: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation." Id. at 114. Each factor should be weighed against "the corrupting effect of the suggestive identification." Id. The circumstances surrounding Barbee's identification preclude a finding that the procedure was either unduly suggestive or unreliable.

First, Barbee's identification of Branch on the night of the robbery was not suggestive because it was not police-arranged. Tarr. Decl., Ex. M at A5. Barbee approached the officers in a near-frantic state of mind yelling that "they" – the occupants of the Green Acura – had shot at him. Tr. Trans., vol. 2 at 56:8-57:5; vol. 3 at 192:4-193:6; 233:6-10. This information was consistent with the report transmitted by dispatch, only moments earlier, that a shooting had taken place in the area. Id., vol. 2 at 41:11-42:3. As the trial judge noted, the police acted "upon information supplied to them by [Barbee], an identifiable citizen informant . . . that the occupants of the green Acura . . . had just fired a shot at Barbi [sp]." Id. at 149:9-17.

In that regard, nobody suggested to Barbee that Branch could have been one of the assailants. Instead, it was Barbee who led the police to Branch and Mitchell. See Richardson, 2010 WL 3619781, at *5 (spontaneous identification of witness at police station not unduly

26

suggestive where petitioner not pointed out to witness); People v. Burwell, 56 A.D.3d 304, 305, 868 N.Y.S.2d 614, 615 (1st Dep't 2008) (no suppression of identification at scene of burglary where witness led police to basement to search for suspect); People v. Boutte, 304 A.D.2d 307, 308 757 N.Y.S.2d 283 (1st Dep't 2003) (spontaneous identification of defendant immediately following crime not suppressed).  In similarly exigent circumstances, the Second Circuit has held that even a police-arranged identification procedure passes constitutional muster.  See Palacios, 589 F.3d at 566 (show-up outside Manhattan nightclub "immediately following the commission of a violent crime in the vicinity, [is not] unlawful . . .").

Next, the Court must consider the reliability of the identification.  Manson, 432 U.S. at 114.  Barbee's identification was reliable for several reasons.  First, Barbee had an opportunity to view his assailants during the robbery, and thereafter focused his attention on them until their apprehension by the police.  Barbee testified that the defendants faced him as they commanded him to take off his watch and that he turned his face away only in the brief seconds after the gun was discharged.  Tr. Trans., vol. 2 at 68:22-69:9.  Although Barbee admittedly focused his attention on the gun aimed at his head, he was able to describe the clothing worn by the assailants, and viewed them continuously from the commission of the crime until their apprehension by law enforcement moments later.  Id. at 48:8-13, 66:8-19, 68:22-69:10.

Barbee also demonstrated a heightened "level of certainty" as to the identity of his assailants.  Manson, 432 U.S. at 114.  He excitedly ran towards the police officers and, unprompted, "scream[ed] [that]they had shot at him" while pointing to the occupants of the green Acura.  Tr. Trans., vol. 2 at 56:8-57:5; vol. 3 at 193:2-6.  See Richardson, 2010 WL 3619781, at *6 (victim's inability to see defendant's face during crime mitigated by ability later to "quickly" and "confidently" identify petitioner spontaneously).

Finally, the "time between the crime and the confrontation" was minimal.  Manson, 432 U.S. at 114.  The robbery lasted approximately 20 seconds, at the conclusion of which Barbee and Rodriguez pursued the getaway car for approximately four blocks.  Id. at 54:14-15, 84:13-22,155:2-160:19, 161:11-162:6.

Branch also argues that he was entitled to a police-arranged line-up.  It is well-settled that there is no constitutional right to a line-up, "and the decision whether to grant one is a matter for the exercise of discretion by the trial court."  Sims v. Sullivan, 867 F.2d 142, 145 (2d Cir. 1989); Alvarez, 2005 WL 3434634, at *8 ("There is no constitutional right to a lineup").  Nonetheless, a trial court's failure to grant a lineup may result in a constitutional violation if the "in-court identification is so unreliable that a very substantial likelihood of irreparable misidentification exists."  Sims, 867 F.2d at 145 (quoting Manson, 432 U.S. at 116).

Barbee's inability to positively identify Branch at trial does not undercut the reliability of the spontaneous identification.  The jury was free to accept or reject Barbee's testimony and was specifically instructed by the trial judge to "take into account all the facts and circumstances that existed at the time the witness made his or her observation."  Tr. Trans., vol. 3 at 579:19-22.  See Sims, 867 F.2d at 145-46 (witness's pre-trial and in-court statements that he was "less than one-hundred percent positive" regarding his identification of defendant insufficient to warrant suppression).  Even if it rejected Barbee's in-court identification of Branch, the jury likely was persuaded by the prosecution's ability to establish an uninterrupted chain of events placing Branch at the robbery, and emerging from the getaway car moments later.

Appellate attorneys are in the uniquely challenging position of choosing what they perceive to be meritorious claims and abandoning those claims that, while colorable, appear weak.  See Jones, 463 U.S. at 753 ("A brief that raises every colorable issue runs the risk of burying arguments . . .").  In light of the foregoing, counsel's strategic decision not to challenge

28

the legal sufficiency of the identification of Branch can hardly be considered deficient in light of the overall weakness of the argument and the overwhelming evidence placing him at the scene of the crime.

For these reasons, the Court cannot conclude that the Appellate Division's rejection of this claim amounted to an unreasonable application of Strickland.

## IV.   CONCLUSION

For the foregoing reasons, I recommend that the Petition be denied in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2).

### PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, United States Courthouse, 500 Pearl Street, Room 2260, New York, New York, 10007, and to the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Castel. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Am, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.  If Petitioner does not have access to cases cited herein that are reported on LEXIS/WESTLAW, he should request copies from Respondent's counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (noting that the Court may ask opposing counsel to provide, to a pro se litigant, copies of decisions that are available electronically).

Dated: New York, New York
      October 8, 2010

JAMES L. COTT
United States Magistrate Judge

**Copies of this Report and Recommendation are being sent by mail to:**

Terry Branch
04-A-4079
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

Ashlyn Dannelly
Paul M. Tarr
Assistant Attorneys General
120 Broadway, 22nd Floor
New York, New York 10271

Pro Se Office, Room 230

Hon. P. Kevin Castel